UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Warren E. Peterson

     v.                                    Civil No. 05-cv-055-PB

Donna Roe, et al.

**REPORT AND RECOMMENDATION**

Warren Peterson filed a complaint pursuant to 42 U.S.C. §
1983 alleging that his right to adequate medical care and his
procedural due process rights had been violated by employees of
the New Hampshire State Prison (document no. 4).  On April 27,
2005, this Court issued a Report and Recommendation recommending
dismissal of the due process claim (document no. 5) and an Order
directing service of the medical care claim against Jane Coplan
(document no. 6).  Rather than file an objection to the Report
and Recommendation, Peterson has now filed an Amended Complaint
(document no. 8) which has been referred to me (document no. 9)
for consideration of whether or not the Amended Complaint affects
the Report and Recommendation previously issued in this case.[1]

_____

[1]Because Peterson is proceeding *pro se*, and has not included
all of the information provided in his original complaint in the
amended complaint, I will accept the complaint (document no. 4)

For the reasons stated herein, I find that the Amended Complaint, to the extent it was intended to adequately state a due process claim, fails to revive that claim to allow it to proceed.  The amended complaint also seeks to add five defendants and a number of additional claims to this action.  Peterson has also requested the appointment of counsel in this matter.

Standard of Review

Under this Court's local rules, when an incarcerated plaintiff commences an action *pro se* and *in forma pauperis*, the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (i) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2).  In conducting the preliminary review, the Court construes *pro se* pleadings liberally.  See <u>Ayala Serrano v. Lebron Gonzales</u>, 909 F.2d 8, 15 (1st Cir. 1990) (following

---

and the amended complaint (document no. 8), in the aggregate, as the complaint in this matter.

Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe *pro se*
pleadings liberally in favor of the *pro se* party).  "The policy
behind affording *pro se* plaintiffs liberal interpretation is that
if they present sufficient facts, the court may intuit the
correct cause of action, even if it was imperfectly pled."  Ahmed
v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997), cert. denied,
Ahmed v. Greenwood, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions
made by the plaintiff and inferences reasonably drawn therefrom
must be accepted as true.  See Aulson v. Blanchard, 83 F.3d 1, 3
(1st Cir. 1996) (stating the "failure to state a claim" standard
of review and explaining that all "well-pleaded factual
averments," not bald assertions, must be accepted as true).  This
review ensures that *pro se* pleadings are given fair and
meaningful consideration.  See Eveland v. Dir. of C.I.A., 843
F.2d 46, 49 (1st Cir. 1988).

<u>Background</u>

1.   Facts Relating to Claims Alleging Inadequate Medical Care
Warren Peterson, a NHSP inmate, alleges that in 1985, he had
surgery to repair an anal fissure.  This surgery resulted in
scarring and permanent narrowing of his anus.  As a result,

3

Peterson's doctor placed him on a strict high and whole fiber diet that he was told he would have to follow for the remainder of his life.

Prior to beginning his NHSP sentence, Peterson was held in the custody of the Rockingham County Department of Corrections, and was provided with his medically required high/whole fiber diet at that institution. On November 11, 1999, Peterson was transferred to the NHSP, where his high/whole fiber diet was discontinued. During his first two years at the NHSP, Peterson made twenty-five requests for his high/whole fiber diet to be reinstated. As a result of the discontinuation of his high/whole fiber diet, Peterson began to suffer from medical problems.

On April 27, 2001, more than seventeen months after his transfer to the NHSP, Peterson received a medical pass from the NHSP dietician to receive cereal bran once each morning. On May 7, 2001, Peterson saw Dr. Russell Strong at Concord Surgical Associates due to his increasing constipation and anal pain. Dr. Strong recommended, among other things, that Peterson receive a high fiber diet. Peterson saw Dr. Strong again on June 11, 2001 for a follow-up. Dr. Strong again recommended a high fiber diet.

4

On July 31, 2001, however, Peterson's medical pass for cereal bran expired and was not renewed.

Peterson continued to request a high/whole fiber diet, but his requests were met with directives to report to Health Services for sick call if he was sick, increase his water intake, increase his exercise, and a statement that the regular diet he received at the NHSP was sufficiently high in fiber.  On September 9, 2001, after twenty-two months at the NHSP, Peterson was approved for a high fiber diet, but did not receive his diet sticker allowing him a special diet for an additional two months. Once he received his sticker, Peterson was provided with extra canned fruit and/or extra vegetables each day.

In December of 2001, Peterson was again prevented from eating with the inmates receiving special diets because his name was not on "the list."  This omission was not rectified for several months.  Again, the delay in the provision of a medically appropriate diet resulted in Peterson suffering from constipation and anal pain.

On February 6, 2002, while housed at NHSP's South Unit, Peterson requested a pass to go to the infirmary for a medical emergency at 4:00 p.m. because he was suffering from extreme pain

as a result of his constipation and needed medical attention.  He
was referred by the corrections officer on duty to Sgt. Blake, to
whom he also explained his problem.  Blake told Peterson the
infirmary wouldn't see him until the next morning's sick call.
Peterson attempted to wait, but the situation did not resolve and
his pain intensified.

By 6:00 p.m., Peterson's situation was severe enough that
Blake called the infirmary to request that Peterson be seen for
an emergency visit.  Although the medical staff at the infirmary
was aware of Peterson's serious medical condition and was advised
by Blake of the severity of the situation, the infirmary nurse
told Blake over the phone that Peterson would have to wait for
the following morning's sick call.

By 8:00 p.m., Peterson's pain was excruciating and was not
relieved with high doses of ibuprofen.  Blake again called the
infirmary and Peterson was permitted to speak on the telephone
with a nurse named Donna.  Donna told Peterson he would have to
wait until the morning sick call because the infirmary had no
ability to provide emergency care.

At 11:30 p.m., Peterson was in his cell and called the
corrections officer on the intercom to say again that he needed

to be seen on an emergency basis.  When the corrections officer asked Peterson what the problem was, Peterson believed that his efforts to obtain care were futile and didn't press his request at that time.  Instead, Peterson attempted to kill himself by cutting his throat with a razor blade.  After his suicide attempt, two corrections officers arrived at his cell and took Peterson to a holding tank and left him there without clothing or cover or any relief for his pain.  A captain arrived to question Peterson, who told the captain he was in unbearable pain and needed medical attention.  Peterson explained that the intestinal blockage he was experiencing was now putting pressure on his kidneys and bloating his stomach so that in addition to his constipation, he was unable to urinate.  The Captain refused Peterson's request for emergency medical treatment, and returned Peterson to his cell with instructions to "behave."  Peterson's pain continued unabated through the night.

At 5:30 a.m. on February 7, 2002, Peterson asked C.O. Lanman if he could go to sick call early.  Lanman refused the request, stating that it made the infirmary staff angry when inmates were sent early to sick call.  Peterson was allowed to go to the infirmary shortly after 7:00 a.m.  Once at the infirmary,

Peterson waited an hour and a half to be seen by the medical staff.  Peterson was then catheterized and 1000cc of urine was drained from his bladder.  Peterson was returned to the waiting room to wait to be seen by the doctor.

Peterson was seen by Dr. Fellows from mental health regarding his suicide attempt.  Dr. Fellows moved Peterson to an isolation tank and placed him on suicide watch with instructions that he be checked every fifteen minutes.  There was neither a toilet nor running water in the isolation tank.  Peterson was held in the isolation tank for several hours, and only checked on once, despite the fact that he was pleading to see a nurse and to receive some medication for his pain.

At 1:30 p.m., Peterson was seen by nurse Brad.  Brad told Peterson he would be given an enema.  After 2:00 p.m., the enema was administered, and after twenty minutes, the blockage passed, leaving an enormous mess.  Peterson was given paper towels and told to clean the mess himself.  He subsequently passed out.

The following morning, February 8, 2002, the pressure and anal pain began to return, but Peterson was still being held in the isolation tank with no access to a toilet or running water. Corrections officer Caoutte was on duty, and although he was

supposed to check on Peterson every fifteen minutes, those checks
were done less frequently.  Peterson attempted to get the
attention of a staff member so that he could gain access to a
toilet but received no response.  The signal light he was
supposed to use to get a staff member's attention was not
functioning.  When Peterson was given access to a toilet, he was
rushed and was not able to resolve his situation.  Peterson was
then left for several hours without access to a toilet.  At that
time, he relieved himself on the floor, again creating a mess.
Peterson then fell asleep but was awoken by a corrections officer
who berated Peterson and told him to clean up the mess.

Peterson filed a grievance with Warden Coplan but was
scolded for defecating on the isolation tank floor.  He appealed
the grievance to the Commissioner but never received a response.
Instead, Peterson says that he was written up for a disciplinary
violation and charged $83 to replace a plastic mat that he had
torn while clutching it in pain.

Peterson now claims that he was denied adequate medical care
for his serious medical condition in that (1) he was denied a
medically necessary diet for a period in excess of two years,
beginning on November 11, 1999 and continuing until after the

9

February 2002 incident described herein, (2) he was made to
suffer through horrible pain and lack of treatment during the
episode occurring between February 6 and February 8, 2002, (3)
that the lack of medical care at the NHSP caused him to suffer a
blocked urethra, and a worsening of his previously diagnosed
medical problems and pain, and (4) that he suffered from the
serious mental illness chronic depression which was exacerbated
by the lack of medical care he received.

2.    Facts Relating to Due Process, Property Loss, Denial of
      Access to the Courts, Conditions of Confinement and Other
      Claims

     Peterson alleges that he takes a prescribed drug, Effexor
XR, daily, and that as a consequence, he frequently suffers from
an impaired ability to urinate.  Peterson claims that this is a
known side effect of the medication, and that the NHSP medical
staff is aware that Peterson suffers from this side effect, and
has treated him for it.

     Peterson further alleges that despite having no history of
substance abuse, and no positive urine screens during his
incarceration, he was requested to provide urine samples for drug
screening on December 13, 2002 and February 23, 2003.  On both
occasions, Peterson was unable to provide a urine sample due to

10

the effects of his prescribed medication.  Despite the fact that
his medical condition was documented at the NHSP, Peterson
alleges that Warden Jane Coplan, Health Services Security Officer
Caoutte and NHSP Security Lieutenant Torez subjected Peterson to
disciplinary proceedings for failing to provide urine samples on
those occasions.  Peterson was eventually exonerated of the
disciplinary charges against him, but not before he served forty
days in punitive segregation for the charges.

     As a result of the disciplinary procedures against him,
Peterson says that he was moved within the institution a number
of times, resulting in the loss, damage, or destruction of over
$1000 of his property.  Some of the items in question were
extensive legal files that Peterson had maintained, that were
disheveled, misplaced, or damaged.  Peterson claims that
Corrections Officers Scott Nachodil, Ray, and a John Doe
corrections officer, as well as Coplan, were responsible for the
improper handling of his legal documents.

     In addition to the occasions, after his suicide attempt,
where he was held in the cold with inadequate clothing or cover
and without access to a toilet, Peterson claims that when he was

held at SHU between December of 2002 and January 2003, he was held in a cell into which sewage was backing up.

Peterson also asserts that during a time when he was held at the NHSP's Closed Custody Unit, the correctional staff allowed him to be threatened by other inmates.  Peterson also claims that his frequent transfers resulted in his being denied a job he had been promised in the institution, which would have provided him with positive facts to bring to a parole hearing.  Peterson alleges that his chances to be granted parole have been diminished by the denial of programming, employment and other opportunities to present positive facts to the parole board.

<u>Discussion</u>

1.  <u>Inadequate Medical and Mental Health Care Claims</u>

The Eighth Amendment protects prison inmates from prison officials acting with deliberate indifference to their serious medical needs.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994). To assert a viable cause of action for inadequate medical care, an inmate must first state facts sufficient to allege that the plaintiff has a serious medical need for which adequate care has not been provided.  <u>Farmer</u>, 522 U.S. at 831; <u>Rhodes v. Chapman</u>, 452 U.S. 337 (1981); <u>Estelle</u>, 429 U.S. at 106.  The inmate must

12

then allege that a responsible prison official was aware of the need or of the facts from which the need could be inferred, and still failed to provide treatment.  <u>Estelle</u>, 429 U.S. at 106.  A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated.  <u>Barrett v. Coplan</u>, 292 F.Supp.2d 281, 285 (D.N.H. 2003); <u>Kosilek v. Maloney</u>, 221 F.Supp.2d 156, 180 (D.Mass. 2002) (citing <u>Farmer</u>, 511 U.S. at 835-47); <u>see also</u> <u>Mahan v. Plymouth County House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995) (defining a serious medical need as one "'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'").  The Eighth Amendment's guarantee of adequate medical care applies to both mental health and physical health needs.  <u>Torracco v. Maloney</u>, 923 F.2d 231, 234 (1st Cir. 1991).

"Adequate medical care" is treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations.  <u>United States v. DeCologero</u>, 821 F.2d 39, 42-43 (1st Cir. 1987).  This does not mean that an

13

inmate is entitled to the care of his or her choice, simply that
the care must meet minimal standards of adequacy.  Deliberate
indifference may be found where the medical care provided is "so
clearly inadequate as to amount to a refusal to provide essential
care."  Torracco, 923 F.2d at 234.  Constraints inherent in a
prison setting may affect the choice of care provided, and may be
relevant to whether or not prison officials provided inadequate
care with a deliberately indifferent mental state.  Wilson v.
Seiter, 501 U.S. 294, 302 (1991).

In this case, Peterson had a history of painful medical
conditions as well as serious psychological and psychiatric
problems that were well-known to the prison.  Not only had
Peterson been treated for these conditions at Rockingham County
Department of Corrections prior to his incarceration at NHSP, but
he made all of the medical staff at the NHSP aware of his medical
needs and the severity of those needs, and he provided them
access to his medical records.  Further, during his incarceration
at the NHSP, Peterson was treated a number of times for both his
medical and mental health conditions.  Although Peterson's
serious medical and mental health needs were well-documented by
treating physicians, Peterson alleges that the defendants in this

14

case denied him adequate medical care in the form of adequate medication, diet, or other treatment to alleviate his pain and to treat his mental health issues.  I find, as I did in my April 27 Report and Recommendation, that Peterson has adequately stated a claim for inadequate medical and mental health care in violation of the Eighth Amendment.  Accordingly, I will direct all of these claims to be served on defendants Marie Wharing, the dietician at the NHSP who denied Peterson a medical diet, Lanman, Caoutte and Coplan in an Order issued simultaneously with this Report and Recommendation.

2.   Due Process

In Peterson's initial complaint, he alleged a due process claim arising out of what he alleges were sanctions he was made to endure for a disciplinary violation of which he was later exonerated.  In my April 27 Report and Recommendation, I recommended dismissal of the due process claims because Peterson failed to state any consequence of a disciplinary proceeding that exceeded the scope of his underlying sentence or of the reasonable expectations of incarcerative life.  See Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  Nothing in Peterson's

amended complaint rescues his due process claim, however, and I
continue to recommend that it be dismissed.

3.   <u>Transfers</u>

Peterson alleges that while his disciplinary proceedings
were pending, he was, as a result of those proceedings,
transferred forty-three times and subjected to a higher
classification level, and subjected to conditions of confinement
that were more burdensome than those in which he had previously
been held.  Peterson alleges that this was in violation of his
rights.  In <u>Meachum v. Fano</u>, the Supreme Court held that if an
inmate is transferred within the sentencing state, absent a state
law or practice that creates a right for the inmate to certain
pretransfer procedures, the inmate has no liberty interest in
being housed or classified in a particular facility or in a
particular security status.  427 U.S. 215, 225 (1976).  "[A]n
increase in burdensome conditions does not in itself implicate
the due process clause."  <u>Sisbarro v. Warden</u>, 592 F.2d 1, 3 (1st
Cir. 1979) (citing <u>Meachum</u>, 427 U.S. at 224-25).  This is so
because when a prisoner receives a state prison sentence, that
sentence anticipates that the inmate might be held in any of the
state prison facilities or classifications in the state and

authorizes the prison administration to execute the sentence in accordance with those expectations.  <u>Meachum</u>, 427 U.S. at 224-225 (a state is empowered to house a convicted prisoner "in any of <u>its</u> prisons" and can transfer an inmate "from one institution to another <u>within the state prison system</u>" because "[c]onfinement in any of <u>the State's institutions</u> is within the normal limits or range of custody which the conviction has authorized the state to impose." (emphasis added)); <u>Montanye v. Haymes</u>, 427 U.S. 236, 242 (1976) (discussing that the holding in <u>Meachum</u> dictates that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.").  Here, Peterson does not allege facts sufficient to state a constitutional violation for transfers within the NHSP or the addition of burdensome conditions of confinement occasioned by those transfers.  Therefore, I recommend that Peterson's claims relating to his transfers within the NHSP be dismissed.

4.   <u>Conditions of Confinement</u>

Peterson alleges that the conditions of his confinement during times that he was housed at the Secure Housing Unit and the infirmary's isolation tank at the NHSP were unconstitutional in that, during those times, he was either subjected to inhumane and unsanitary sewage flowing into his cell, and was denied access to a toilet and running water for extended periods of time, Peterson further alleges that at times he was held in cells with inadequate protection from the cold.

Prison conditions for sentenced inmates are scrutinized under the Eighth Amendment, which protects against the infliction of cruel and unusual punishment.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).  The Eighth Amendment prohibits any punishment which violates civilized standards of decency or involves the "unnecessary and wanton infliction of pain."  <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977) (<u>quoting</u> <u>Estelle</u>, 429 U.S. at 102-03).  An Eighth Amendment claim challenging conditions of confinement contains both an objective and a subjective component.  <u>See</u> <u>Wilson</u>, 501 U.S. at 298.  The objective component requires the plaintiff to demonstrate that he has been subjected to specific deprivations that are so serious that they deny him "the minimal

18

civilized measure of life's necessities." <u>Rhodes</u>, 452 U.S. at 347.  The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs.  <u>See Farmer</u>, 511 U.S. at 834; <u>Wilson</u>, 501 U.S. at 298-99.  Deliberate indifference is the reckless disregard of a substantial risk of serious harm. "Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." <u>Farmer</u>, 511 U.S. at 835.  I find that the conditions described by Peterson regarding sewage in his cell and lack of access to running water or toilet facilities or lack of adequate clothing or cover to protect him from the cold state a claim for unconstitutional prison conditions upon which relief might be granted.  Accordingly, I find that Peterson's allegations regarding his conditions of confinement claim are sufficient to state a claim upon which relief might be granted.  Peterson has failed, however, to name any defendant responsible for the conditions complained of, and so I recommend this claim be dismissed at this time.  Peterson may renew this claim if he properly amends his complaint to name specific defendants

responsible for his subjection to the unconstitutional conditions
of confinement he describes.

5.   <u>Property Claim</u>

Peterson alleges that as a result of his transfers within
the NHSP, he was deprived of over $1000 worth of property by
virtue of theft, loss, damage, or prison regulations restricting
the possession of property he was previously permitted to have.
Claims alleging the theft, damage, loss or other misappropriation
of property are not actionable under 42 U.S.C. § 1983 where, as
here, the state has an adequate post-deprivation remedy is
available.   <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984); <u>see</u> N.H.
Rev. Stat. Ann. 541-B:9(II) & (IV), and 541-B:14 (1997)
(providing a post-deprivation means of recouping property loss
attributable the State).   Therefore, I recommend this claim be
dismissed from this action.

6.   <u>Denial of Access to the Courts Claim</u>

Peterson claims that his rights were violated by the loss,
destruction or intentional mishandling of his legal papers.
Although he did not plead a claim for denial of access to the
courts, a liberal reading of the complaint indicates that
Peterson may have been attempting to claim a violation of that

20

right when his legal paperwork was tampered with.  Although prisoners are not granted all of the constitutional rights guaranteed to nonincarcerated people, they maintain a constitutional right of access to the courts that affords them access to the tools necessary to challenge their criminal cases, criminal convictions and sentences directly or collaterally, to file habeas petitions, or to challenge the conditions of their confinement through civil rights actions.  Lewis v. Casey, 518 U.S. 343, 345 (1996).  In order to state a claim for denial of access to the courts under § 1983, a prisoner must demonstrate that the actions that resulted in the deprivation of access to the courts "hindered his efforts to pursue a legal claim" that he is constitutionally entitled to pursue during his incarceration. Id. at 351.

Here, Peterson has only stated that his legal paperwork was misplaced and/or mistreated.  He has not stated whether, or how, any legal case he was constitutionally entitled to pursue has been damaged by the removal of the paperwork from his cell. Therefore, I find that he has failed to state a claim for the denial of access to the courts alleging these facts and I recommend that this claim be dismissed from this action.

7.   <u>Claim that Defendants Allowed Peterson to be Threatened</u>

Peterson claims that the defendants violated his
constitutional rights by allowing him to be housed in a place
where he was threatened by other inmates.  The state is required
to protect prison inmates from harm from other inmates in some
circumstances.  <u>See</u> <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 34 (1st
Cir. 2005) (citing <u>DeShaney v. Winnebago County Dep't of Soc.</u>
<u>Servs.</u>, 489 U.S. 189, 197, 200 (1989)).  However, there is no
constitutional right to be protected from verbal threats not
associated with any actual physical harm.  <u>See</u> <u>Shabazz v. Cole</u>,
69 F.Supp.2d 177, 198-201 (D.Mass. 1999) (citing authority to
explain that racial slurs and verbal threats do not violate a
prisoner's constitutional rights).  Accordingly, I find that
Peterson has not alleged a constitutional violation upon which a
viable § 1983 claim might rest and I recommend that this claim be
dismissed from this action.

8.   <u>Claim Alleging Loss of a Prison Job</u>

Peterson alleges that as a result of the defendants'
actions, he was denied a prison job to which he was entitled.  To
the extent that Peterson raises this as a constitutional
violation claim under § 1983, "it is clear that unless state laws

22

or regulations are to the contrary, prisoners have no vested property or liberty rights to either obtain or maintain prison jobs." Dupont v. Saunders, 800 F.2d 8, 10 (1st Cir. 1986). Peterson therefore lacks any federal constitutional claim with respect to not being given a prison job and I recommend this claim be dismissed.

9.   Claim Alleging Damage to Chances of Receiving Parole

Peterson alleges that by virtue of the disciplinary proceedings against him, he lost a job, was moved several times, was subjected to a higher classification, and was denied programming.  Although he was eventually exonerated of disciplinary charges, Peterson alleges that these consequences of the proceedings hurt his chances of receiving parole by depriving him of the opportunity to present positive facts to the parole board.

A convicted person has no constitutional right to be conditionally released before the expiration of a valid sentence. See Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979).  A valid conviction, with all its procedural safeguards, extinguishes that liberty right.  Id.; see also Meachum, 427 U.S. at 224.  A right to parole under the Due

Process Clause exists only if such right is created by state law.
See Sandin, 515 U.S. at 483-84; Hamm v. Latessa, 72 F.3d 947,
954-55 (1st Cir. 1995); Brooker v. Warden, N.H. State Prison, No.
98-466-JD, 1999 WL 813893, at * 2 (D.N.H. June 22, 1999).  Here,
it is clear that Peterson has no state-created liberty interest
in parole.  See Jago v. Van Curen, 454 U.S. 14, 19-21 (1981);
Ainsworth v. Risley, 244 F.3d 209, 216-17 (1st Cir. 2001);
Knowles v. Warden, N.H. State Prison, 140 N.H. 387, 389 (1995).
"In determining whether state law provides a protectable liberty
interest in parole, federal courts are bound by the state's
interpretation of applicable state law unless that construction
or application violates federal law."  Brooker, 1999 WL 813893,
at * 2.

The applicable New Hampshire parole laws are found in
Chapter 651-A of the New Hampshire Revised Statutes Annotated
("RSA").  The statute provides the terms of release for parole:

> A prisoner *may* be released on parole upon the expira-
> tion of the minimum term of his sentence, [as adjusted
> by other statutory provisions], provided that there
> shall appear to the adult parole board, after having
> given the notice required in RSA 651-A:11, to be a
> reasonable probability that he will remain at liberty
> without violating the law and will conduct himself as a
> good citizen.

RSA 651-A:6, I (1996) (emphasis added).  Under the authority

provided by RSA 651-A:4, III, the Parole Board has adopted rules

pertaining to parole policy:

> Parole shall be considered a privilege, something to be
> earned rather than automatically given, and any release
> prior to the maximum term shall be made only upon
> careful and lawful consideration.  An inmate shall not
> be granted parole unless the board finds a reasonable
> probability that the inmate will remain at liberty
> without violating any law and will conduct himself as a
> good citizen, pursuant to criteria in Par 301.02.

N.H. Code Admin. R. Ann. 301.02 (2003).

The New Hampshire Supreme Court has repeatedly held that the

Parole Board has broad discretion in its parole decisions and

that the Board is not mandated to grant parole to an inmate who

meets certain conditions.  See Knowles, 140 N.H. at 389; Cable v.

Warden, 140 N.H. 395, 398 (1995); Baker v. Cunningham, 128 N.H.

374, 381 (1986).  "The possibility of parole is not a right to

liberty conferred by New Hampshire state law."  See Brooker, 1999

WL 813893, at * 4.  Peterson is a convicted prisoner, and

therefore, to the extent that he attempts to assert a claim based

on a diminished opportunity to obtain parole, he has no

constitutionally protected liberty interest in the right to

parole or any state-created liberty interest in parole.

Therefore, I recommend that Peterson's parole-based claim be dismissed.

10.  Request for Court-Appointed Counsel

Peterson's amended complaint contains a request for court-appointed counsel.  The motion is denied.  There is no absolute constitutional right to free legal representation in a civil case.  Bemis v. Kelley, 857 F.2d 14, 15 (1st Cir. 1988).  Rather, appointment of counsel in a civil case is left to the discretion of the court.  See 28 U.S.C. § 1915(d).  An indigent litigant must demonstrate that exceptional circumstances exist to justify appointment of counsel, such that without counsel the litigant most likely would be unable to obtain due process of the law. DesRosiers v. Moran, 949 F.2d 15, 23 (1st Cir. 1991); Cookish v. Cunningham, 787 F.2d 1, 2 (1st Cir. 1986) (per curiam).  In the case at hand, Peterson has failed to establish the existence of such circumstances.  Peterson's motion for counsel is therefore denied without prejudice to refiling in the future should circumstances warrant.

                            Conclusion

For the foregoing reasons, I recommend that all of Peterson's claims be dismissed, except for those claims related

                                26

to inadequate medical and mental health care and medical diet.
In an Order issued simultaneously with this Report and
Recommendation, I will direct service of the inadequate medical
and mental health care and medical diet claims against defendants
Coplan, Wharing, Lanman, and Caoutte.[2]

Any objections to this Report and Recommendation must
be filed within ten (10) days of receipt of this notice.  Failure
to file objections within the specified time waives the right to
appeal the district court's order.  See Unauthorized Practice of
Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United
States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date:  June 23, 2005

cc:      Warren E. Peterson, *pro se*

---

[2]As I advised Peterson in my April 27 Report and
Recommendation, he may seek to add Doe and Roe defendants to this
action once they have been identified through the discovery
process.