**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Warren E. Peterson</u>

     **v.**                              Case No. 05-cv-55-PB
                                              Opinion No. 2008 DNH 002

<u>Jane Coplan, Former Warden,</u>
<u>NH State Prison, et al.</u>


<u>**MEMORANDUM AND ORDER**</u>


     Warren Peterson, an inmate at the New Hampshire State Prison ("NHSP"), alleges that the defendants (all of whom are correctional and medical staff at NHSP) violated his Eighth Amendment right to be free from cruel and unusual punishment by exhibiting deliberate indifference to his serious medical and mental health care needs, starting with his admission to NHSP in 1999 and culminating in an incident which occurred between February 6–11, 2002.  The named defendants are former NHSP warden Jane Coplan, corrections officer Richard E. Caouette, and former NHSP dietician Maryann Wareing.[1]  The defendants have moved for

---

[1] Two omissions from this list are noteworthy.  First, in his Objection to Defendants' Third Motion for Summary Judgment (Doc. No. 57), Peterson stated that he is dropping his claim against corrections officer Christian Lanman.  I therefore dismiss that claim with prejudice.  Second, Peterson also names a

summary judgment.  For the reasons described below, I grant their motion.

## I.  **BACKGROUND**

Peterson's original complaint and amended complaint were unsworn, and he did not provide any separate affidavits during discovery.  His Objection to Defendant's Motion for Summary Judgment II (Doc. No. 29) ("Obj. II"), however, was sworn.  To the extent that Peterson's averments are drawn from personal knowledge, then, the allegations contained within that objection are of evidentiary quality.  Accordingly, this summary of the facts is drawn from Peterson's sworn statements, the medical records that Peterson has proffered, and the much greater volume of evidence proffered by the defendants that Peterson does not properly dispute.[2]

_____

John Doe defendant ("Chief Medical Officer").  However, Magistrate Judge Muirhead's second Report and Recommendation (Doc. No. 12), accepted by my order of July 18, 2005, limited the claims to the defendants whom Peterson had identified by name. Although Peterson received instructions from Judge Muirhead on the proper procedure for doing so, Peterson failed to obtain a name for John Doe; John Doe is therefore not a properly named defendant.

  [2] Peterson also made certain other unsworn allegations without any evidentiary support, many of which were described by

Keeping these limitations in mind, I summarize the evidence available to me, drawing all reasonable inferences from that evidence in Peterson's favor.

## A.  Treatment Prior to February 6, 2002

In 1985, prior to his incarceration, Peterson underwent surgery to repair an anal fissure.  This surgery caused permanent scarring and narrowing of his anus, which made Peterson prone to painful constipation.

Upon his arrival at NHSP in 1999, Peterson repeatedly requested, but did not receive, a diet higher in fiber than the standard NHSP diet, which he believed would alleviate his anal pain and constipation.  Throughout the relevant time period, NHSP's medical providers examined and treated Peterson numerous times in an effort to reduce his anal pain and constipation. They advised him to drink more water, exercise regularly, and supplement his diet with additional fiber sources such as Metamucil.  NHSP records suggest that Peterson disobeyed their

---

Magistrate Judge Muirhead in his Second Report and Recommendation (Doc. No. 12).  In some cases, for the sake of clarity or to provide further background, I describe these unsupported allegations in footnotes or parentheticals.  In general, however, I restrict my recitation of facts to what can reasonably be inferred from the evidence provided to me.

advice by skipping meals and not drinking enough water. A July 24, 2000, nutritional assessment, for example, repeated earlier recommendations that he eat all three meals, exercise more, and drink more water, and then opined that Peterson was "unwilling to initiate change to improve his health status." Although Peterson contends that NHSP's conditions of confinement are responsible for his failure to meet these recommendations during his first two months at NHSP and during his various episodes of solitary confinement, he does not provide explanations for the other periods. Indeed, Peterson appears to concede that he was not a fully cooperative patient. He asserts, for example (writing in the third person), "The plaintiff said he was unwilling to drink More [sic] water, as he was already consuming plenty of fluids each day." (Obj. II at 6.)

NHSP Health Services sent Peterson to a specialist, Dr. Russell Strong, for an outside consultation on May 7, 2001. Dr. Strong recommended that Peterson receive a high-fiber diet, receive sitz baths, receive glyceryl trinitrate, and take Metamucil as a dietary supplement.

Peterson requested that the NHSP provide him with a modified diet in response to Dr. Strong's recommendations. NHSP officials

declined to do so because the regular prison diet contained 29 g of dietary fiber, and the available alternative diets contained less dietary fiber than the regular diet. After some initial confusion regarding what diet Peterson was receiving, Dr. Strong opined that the standard NHSP diet provided sufficient fiber for Peterson's needs because it met or exceeded the daily requisite 25-27 g of dietary fiber.

NHSP officials provided Peterson with a sitz bath[3] and opportunities to use it. Peterson refused the sitz bath because he believed that "he could accomplish far better results by simply turning his back side to a hot shower." (Obj. II at 7.)

There appears to have been a brief delay in providing the glyceryl trinitrate, which was not part of the NHSP infirmary's regular stores and had to be ordered from an outside vendor. Peterson's medical records do not include any notations confirming that the infirmary had ordered glyceryl trinitrate for him until July 17, 2001, when Dr. Strong called to complain that Peterson had not yet received the medication.

---

[3] A sitz bath is a small tub that allows the patient to submerge his or her posterior in warm water. In Peterson's case, the purpose of the sitz bath appears to have been to irrigate his rectum.

In addition to its treatment of Peterson's anal problems, the NHSP provided him with regular psychological evaluation and treatment for recurring depression and suicidal ideation. NHSP psychological staff diagnosed him as suffering from recurring Major Depressive Disorder, as well as Mixed Personality Disorder. Dr. Richard Fellows, who serves as Chief Psychologist for NHSP and Peterson's primary therapist, had numerous regular appointments with Peterson and prescribed various anti-depressants starting soon after Peterson's admission to NHSP, including Zoloft, Paxil, Dexepin, Effexor, and Remeron. Peterson was placed on suicide watch six times between November 1999 and February 2002. NHSP officials monitored his medications and dosages, adjusting them multiple times in response to his suicide threats and suicide attempts.

**B.**   **Treatment on February 6, 2002**

Nurse Coordinator Donna Timulty was on duty in the infirmary from 3:00 p.m. to 11:00 p.m. on February 6, 2002, after sick call had ended for Peterson's unit. Starting at approximately 4 p.m., Peterson repeatedly asked the corrections officer on duty to take him to the infirmary for emergency treatment.

Under NHSP policy, when an inmate requests medical
assistance after sick call is over for his unit, the nurse on
duty conducts telephone triage to determine whether the situation
requires immediate treatment.  In this telephone triage, the
nurse should obtain as much information as possible from the
corrections officer or unit manager, consult the inmate's chart,
and then determine whether immediate treatment is necessary.

The corrections officer (not a named defendant) communicated
to Nurse Timulty that Peterson was complaining of constipation.
After consulting Peterson's chart, Nurse Timulty decided that the
situation did not require immediate treatment and recommended
that Peterson wait until the morning sick call for his unit.

Subsequently, Peterson threatened to commit suicide if he
was not immediately admitted to the infirmary, and the officer
communicated his threat to Nurse Timulty over the telephone.
Based on her prior experience with Peterson, who had previously
made manipulative threats of suicide, Nurse Timulty concluded
that he was engaging in manipulative behavior and recommended
that Peterson be transferred to the Special Housing Unit (SHU).
The officer then telephoned Nurse Timulty a third time, and she
spoke directly with Peterson over the telephone.  Peterson

repeated his constipation complaints, telling her that the pain from constipation was "excruciating."  (Obj. II at 8.) Nevertheless, Nurse Timulty determined that Peterson did not need emergency care and again concluded that his suicide threat was not genuine, so she instructed Peterson to drink more water and wait until the morning sick call.

Later that evening, after lockdown, Peterson made one more call to the corrections officer on duty, but ended the conversation after deciding his request was futile.  He then went into the bathroom and cut himself with a razor blade. Corrections officers discovered Peterson bleeding in the bathroom.  He told them he was shaving, but they saw no shaving instruments and decided to take him to a holding tank.  Peterson later admitted to Catherine Fontaine, Consultant/Psychiatric Registered Nurse, that this was not a genuine suicide attempt but an instance of manipulative behavior to try and gain access to the infirmary and establish that corrections officers were not doing their jobs.

Peterson was kept in the holding tank for the rest of the night.  About half an hour after being moved to the holding tank, Peterson repeated his earlier complaints of anal pain to the

shift commander (not a named defendant), and added that his problems now included difficulty urinating. (Obj. II at 9.) Nothing in the record suggests that this information was ever communicated to the infirmary or to NHSP medical staff. At 5:30 a.m., Peterson requested that corrections officer Lanman take him to the infirmary, but Lanman refused to do so until the infirmary opened for the morning sick call. At 7:00 a.m., Peterson was then taken to the morning sick call in the infirmary.

## C.  **Treatment from February 7, 2002 through February 11, 2002**

Upon Peterson's admission to the infirmary, Nurse Brad Bowden examined Peterson and catheterized him to drain urine. Peterson then requested an enema. After Nurse Bowden left the room, Dr. Richard Fellows, Chief Psychologist of NHSP, met with Peterson. At 10:05 a.m., Dr. Fellows ordered that Peterson be placed on suicide watch, with instructions to check on him at fifteen minute intervals. Peterson's requested enema was ordered at 10:40 a.m.[4] That evening, Peterson smeared peanut butter on

---

[4] Peterson's amended complaint made unsworn allegations that the enema caused him to defecate on the floor, that he was ordered to clean up the resulting mess, and that he was left passed out on the floor afterward. Peterson did not, however, provide anything of evidentiary quality supporting those allegations. NHSP records indicate that the enema proceeded without incident.

the camera lens in the room and was thereafter ordered to clean the camera with paper towels.

On the morning of February 8, the infirmary's progress notes indicate that Peterson "got bored & ripped mattress cover" in his room. Nurse Fontaine met with Peterson later that morning to conduct a psychological evaluation, determined that he should remain on suicide watch, and made plans to reassess him on February 11.

On the morning of February 9, Peterson refused lunch and again smeared food on the camera. He then defecated on the floor and moved his mattress in and out of camera view. Nurse Bowden concluded that the defecation was acting-out behavior, and ordered Peterson to clean the room and the camera. Peterson claims that he was "forced" to defecate on the floor because a corrections officer or officers denied him sufficient access to the toilet.[5] (Obj. II at 10.)

---

[5] In his amended complaint, Peterson made an unsworn allegation that defendant Richard Caouette was the corrections officer responsible for supervising Peterson's toilet usage while in isolation. Peterson further alleged that Caouette denied him timely access to the toilet and that when Caouette took Peterson to the toilet, he did not allow Peterson enough time to have a bowel movement. Caouette, however, was out on sick leave on February 7 and did not return to work until February 10, 2002, and Peterson has not submitted any evidence calling into question NHSP's employment records.

On February 10 and 11, NHSP records indicate that Peterson was again constipated and complaining of pain. NHSP personnel supplied him with pain medications. On February 11, after another psychological evaluation, he was released back to his unit.

## II. **STANDARD OF REVIEW**

Defendants have moved for summary judgment. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment must first identify the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported her motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997); see Celotex, 477 U.S. at 323. "At this stage, the nonmoving party 'may not rest upon mere

allegation or denials of [the movant's] pleading, but must set
forth specific facts showing that there is a genuine issue' of
material fact as to each issue upon which he would bear the
ultimate burden of proof at trial." <u>DeNovellis</u>, 124 F.3d at 306
(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256
(1986)).  The test is whether, as to each essential element,
there is "sufficient evidence favoring the nonmoving party for a
jury to return a verdict for that party.  If the evidence is
merely colorable or is not significantly probative, summary
judgment may be granted."  <u>Id</u>. (quoting <u>Anderson</u>, 477 U.S. at
249–50).


### III.  <u>ANALYSIS</u>

Peterson alleges that he received constitutionally
inadequate medical care, including inadequate mental health care,
at the hands of the defendants.

To succeed with such a claim, Peterson must prove "acts or
omissions sufficiently harmful to evidence deliberate
indifference to serious medical needs."  <u>Feeney v. Corr. Med.
Servs., Inc.</u>, 464 F.3d 158, 161 (1st Cir. 2006) (quoting <u>Estelle
v. Gamble</u>, 429 U.S. 97 (1976)), <u>cert. denied</u>, 128 S. Ct. 105

(U.S. 2007).  Mere negligence or malpractice is not enough to
meet this standard.  <u>Estelle</u>, 429 U.S. at 106 ("[m]edical
malpractice does not become a constitutional violation merely
because the victim is a prisoner"); <u>Feeney</u>, 464 F.3d at 162
("when a plaintiff's 'allegations simply reflect a disagreement
on the appropriate course of treatment[, s]uch a dispute with an
exercise of professional judgment may present a colorable claim
of negligence, but it falls short of alleging a constitutional
violation" (quoting <u>Ferranti v. Moran</u>, 618 F.2d 888, 891 (1st
Cir. 1980))).  The two elements –– deliberate indifference and
the existence of a serious medical need –– set a high bar for the
plaintiff.

    For a prison official to engage in deliberate indifference,
the prison official must "know[] of and disregard[] an excessive
risk" of harm to the inmate.  <u>Farmer v. Brennan</u>, 511 U.S. 825,
837 (1994).  The official must have "actual knowledge of
impending harm, easily preventable" and nevertheless disregard
that knowledge.  <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir.
1991).  "[A]n official's failure to alleviate a significant risk
that he should have perceived but did not, while no cause for
commendation, cannot under our cases be condemned as the

infliction of punishment." <u>Farmer</u>, 511 U.S. at 838.

The First Circuit has defined a serious medical need as one "'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Mahan v. Plymouth Cty. House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995) (quoting <u>Gaudreault v. Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990)).

## A.   **Diet and Constipation Treatment Prior to February 6, 2002**

### 1.   **High-Fiber Diet**

Peterson alleges that NHSP failed to provide him with the high-fiber diet recommended by Dr. Strong, and that the prison's failure to provide such a diet constituted deliberate indifference to his serious medical needs.  Even assuming that a deviation from Dr. Strong's dietary recommendations would meet the standard for deliberate indifference for any of the named defendants, Peterson has failed to create a genuine dispute over whether or not the NHSP diet satisfied Dr. Strong's recommendations.

First, Peterson has failed to create a genuine dispute over whether the NHSP diet, as described in the menus, satisfied Dr. Strong's recommendations.  Dr. Strong's letter of July 30, 2001,

indicates that a diet providing 25–27 g of dietary fiber would conform to his recommendations. The NHSP's 2001 Regular Menu Analysis states that the prison diet contained an average of 29 g of dietary fiber. Peterson argues that the NHSP's regular diet was not sufficient because it was not specifically labeled as a "special diet," "high fiber diet," or "medical diet." In Dr. Strong's medical judgment, however, the regular diet was sufficient to meet Peterson's fiber needs. Peterson's lay judgment that the diet contained insufficient fiber does not trump Dr. Strong's expert medical judgment.

Second, Peterson has failed to create a genuine dispute over whether the NHSP diet, as actually served, satisfied Dr. Strong's recommendations. Peterson makes generalized allegations that the food actually served often contains more processed food and less fresh fruit and vegetables than listed on the menu. He has not, however, provided evidence of the frequency or nature of such substitutions during the period from 1999 to 2002 as identified in his Amended Complaint. As a result, Peterson has failed to create a genuine dispute over either (1) whether such substitutions took place from 1999 to 2002, or (2) whether, if they took place, such substitutions reduced the fiber content of

his meals to a level below Dr. Strong's recommendation of 25-27 g of dietary fiber.  Accordingly, he has failed to create a genuine issue of material fact regarding whether the food served met Dr. Strong's stated requirements.  Furthermore, he has not provided evidence linking any of the named defendants to the alleged menu substitutions.

Accordingly, I grant summary judgment to the defendants as to Peterson's dietary allegations.

### 2.  <u>Other Aspects of Constipation Treatment</u>

To the extent that Peterson alleges that other aspects of his constipation treatment regimen were inadequate, he has failed to carry his burden.  The defendants have established that NHSP medical staff consulted with Peterson numerous times, including referring him to an outside specialist.  They provided him with numerous treatment recommendations to reduce his constipation problems, some of which he followed and some of which he did not. Although Peterson evidently disagreed with the specific recommendations provided to him by NHSP medical staff, he has offered no evidence showing that their recommended course of treatment reflected deliberate indifference to his serious medical needs.  <u>See</u> <u>Feeney</u>, 464 F.3d at 162 (plaintiff's

disagreement with the professional judgments made by prison medical officials, without more, is insufficient to establish a constitutional violation).  Indeed, the only respect in which NHSP officials failed to adhere to Dr. Strong's recommendations was their apparent tardiness in ordering his glyceryl trinitrate prescription.  But even assuming, arguendo, that the delay was caused by the negligence of a NHSP official, Peterson has not proffered any evidence suggesting that any of the defendants acted with the mental state required for deliberate indifference. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner").  I therefore grant summary judgment to the defendants as to Peterson's non-dietary allegations.

**B.    Adequacy of Medical Treatment on February 6, 2002
        and the Early Morning Hours of February 7, 2002**

Peterson alleges that defendants' refusal to admit him to the infirmary during the late afternoon and evening hours of February 6, 2002, and their continuing refusal to admit him during the early morning hours of February 7, 2002, constituted deliberate indifference to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment.

When Peterson alerted the corrections officer to his
constipation, sick call had already ended for his unit.  Thus,
per NHSP policy, he could only be admitted to the infirmary if
his medical complaint qualified as an acute or emergency
condition.  Nurse Timulty followed NHSP policy by conducting
telephone triage, speaking both with the correctional officer on
duty and with Peterson himself.  According to her professional
judgment based on the information available to her, Nurse Timulty
determined that Peterson's constipation did not justify emergency
treatment.  Peterson has offered no evidence suggesting that
Nurse Timulty's decision under this policy rose to the level of
deliberate indifference.

Nurse Timulty does note that, had she been aware that
Peterson was suffering from urinary retention, she would have
cleared him for immediate admission.  Neither Peterson nor the
shift commander, however, communicated any urinary complaints to
Nurse Timulty, so she lacked any knowledge of his urinary
retention.  Without actual knowledge of the retention, she could
not have been deliberately indifferent to it.  See DesRosiers,
949 F.2d at 19.  Thus, Nurse Timulty's failure to treat

Peterson's urinary retention on an emergency basis also does not rise to the level of deliberate indifference.[6]

Similarly, there is no evidence that Nurse Timulty acted with deliberate indifference when she did not accept at face value Peterson's threat that he would commit suicide if he was not immediately taken to the infirmary.  Based on her prior experience with Peterson, Nurse Timulty made a professional judgment that the threat was an attempt at manipulation rather than a genuine suicide threat.  Peterson has offered nothing to call her judgment on this issue into question, so he has no evidentiary basis for claiming deliberate indifference on the basis of that decision.

Accordingly, I grant summary judgment to the defendants as to Peterson's allegations of deliberate indifference to his serious medical needs on February 6, 2002, and the early morning hours of February 7, 2002.

---

[6] Peterson's claim might also be interpreted as arguing that the shift commander's alleged failure to communicate Peterson's urinary complaints to Nurse Timulty constituted deliberate indifference.  Regardless of whether such an argument has merit, however, the shift commander is not a named defendant and his actions cannot be imputed to others who were not aware of those actions.

**C.** **Adequacy of Medical Treatment from February 7, 2002 through February 11, 2002**

Peterson alleges that once he was admitted to the infirmary on the morning of February 7, 2002, the defendants provided treatment so inadequate that their actions constituted deliberate indifference to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment.

Upon admission to the infirmary, Peterson was catheterized, his abdomen was examined, he requested and then received an enema, and he underwent a psychological evaluation. In this way, NHSP medical staff responded to his apparent urinary, anal, and psychological issues. Peterson has failed to carry his burden because he has failed to offer any evidence suggesting that any of these procedures reflected deliberate indifference to his identified medical needs.

After his treatment at the infirmary, Peterson was kept in isolation, with no toilet in the cell. He says that he was denied access to the toilet and was therefore "forced" to defecate on the floor. Defendants, meanwhile, characterize his defecation as acting-out behavior and a ploy to receive more attention, not a genuine loss of control due to insufficient

toilet access.  Even if I assumed that Peterson defecated due to

a loss of control over his bowels rather than a desire to act

out, however, he has not provided any evidence showing that any

particular defendant knew he needed more frequent access to the

toilet and deliberately refused to provide such access, nor has

he established that such denial had serious medical consequences.

Thus, he has failed to carry his burden of showing that the

limitations on his access to the toilet constituted deliberate

indifference to his serious medical needs.

Accordingly, I grant summary judgment to the defendants as

to Peterson's allegations of deliberate indifference to his

serious medical needs from February 7, 2002, through February 11,

2002.

**D.    <u>Supervisory Liability</u>**

Peterson alleges that Jane Coplan is liable for the actions

of her subordinates under a respondeat superior theory.  However,

42 U.S.C. § 1983 focuses on those who have actually abused their

positions of authority, not those who have merely been

insufficiently diligent at monitoring their subordinates.

<u>Martinez-Velez v. Rey-Hernandez</u>, 506 F.3d 32, 41 (1st Cir. 2007).

Thus, a § 1983 claim cannot be predicated on a respondeat

superior theory.  <u>Barreto-Rivera v. Medina-Vargas</u>, 168 F.3d 42, 48 (1st Cir. 1999); <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998).  Instead, "[t]here is supervisory liability only if (1) there is subordinate liability, and (2) the supervisor's action or inaction was affirmatively linked to the constitutional violation caused by the subordinate.  That affirmative link must amount to supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference."  <u>Aponte Matos</u>, 135 F.3d at 192 (internal cites and quotations omitted).

In this case, Peterson has both failed to provide sufficient evidence of constitutional violations by any of Coplan's subordinates, and failed to offer any evidence of "supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference" by Coplan.  <u>See</u> <u>id.</u> Accordingly, his argument for supervisory liability must fail.


## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment on the Merits (Doc. No. 55) is granted.  The clerk is directed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

January 7, 2008

cc:  Warren E. Peterson, pro se
     Mary E. Maloney, Esq.